1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JASMINE MARIA VELASQUEZ,              No.  2:18cv1995 WBS KJN

12               Petitioner,

13        v.                               FINDINGS & RECOMMENDATIONS

14   JANEL ESPINOZA, Warden,

15               Respondent.

16

17   I.  Introduction

18          Petitioner is a state prisoner, proceeding with counsel, with an application for a writ of

19   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges her 2015 convictions for

20   possession of a firearm by a person adjudged a ward of the court and multiple counts of

21   carjacking and robbery, with firearm and gang enhancements found to be true.  (Cal. Pen. Code,

22   §§ 29820, 215(a), 211, 12022(a)(1), 186.22(b)(1)&(4).)  Petitioner was sentenced to a

23   determinate term of 60 years, 4 months, and a consecutive indeterminate term of 90 years-to-life.

24   Petitioner claims the gang enhancements imposed were not supported by sufficient evidence and

25   reversal is required as a result of this constitutional error.

26   //

27   //

28   //

                                            1

1   II. Procedural History

2       On March 18, 2015, a jury found petitioner guilty of multiple counts of carjacking (Cal.

3   Pen. Code, [1] § 215(a)), multiple counts of second degree robbery (§ 211), and one count of

4   possession of a firearm by a person adjudged a ward of the court; additionally, multiple firearm

5   enhancements were found true (§§ 12022(a)(1)), as were enhancements that the offenses were

6   committed for the benefit of a criminal street gang (§186.22(b)(1)&(4)).  (LD 1 at 160-61, 164-

7   87, 232-36; LD 13 at 8.) [2]   The trial court found true a prior strike allegation.  (§§ 667(b)-(i),

8   1170.12, 1192.7(c).)  (LD 13 at 8.)  On May 1, 2015,  petitioner was sentenced to state prison to

9   a total determinate term of 60 years, 4 months concerning counts 3 (§ 211 [principal]), 5, 7, 8, 9,

10  10, 11 (§ 211) and 12 (§ 29820), and an indeterminate and consecutive term of 90 years-to-life for

11  counts 1, 2, 4 and 6 (§ 215(a)).  (LD 1 232-36; LD 9 at 1165-68.)

12      Petitioner appealed the conviction to the California Court of Appeal, Third Appellate

13  District.  The Court of Appeal affirmed the conviction in its entirety.  (LD 13.)

14      Thereafter, petitioner filed a petition for review in the California Supreme Court, which

15  was denied on May 17, 2017.  (LD 14-15.)

16      Petitioner filed the instant petition on July 19, 2018.  (ECF No. 1.)  Respondent answered

17  on December 3, 2018.  (ECF No. 10.)  Petitioner filed a traverse on December 28, 2018.  (ECF

18  No. 12.)

19  III.  Facts[3]

20      In its unpublished memorandum and opinion affirming petitioner's judgment of

21  conviction on appeal, the California Court of Appeal for the Third Appellate District provided the

22

23  [1] Further statutory references are to the California Penal Code unless otherwise indicated.

24  [2] "LD" refers to the documents lodged with this court by respondent on December 3, 2018;
    "ECF" refers to the docket entries in this court's electronic case management filing system; page
25  number references are to those assigned by the ECF system.

26  [3]  The facts are taken from the unpublished opinion of the California Court of Appeal for the
27  Third Appellate District in People v. Velasquez, case number C079255, filed February 17, 2017,
    a copy of which was appended to the habeas petition as Exhibit A and also lodged by respondent
28  as LD 13.

2

following factual summary:

## A. The Crimes

### *Honda Civic Carjacking (counts one and two—§ 215, subd. (a))*

On April 16, 2013, two Hispanic men wearing bandanas over their faces approached Martin and Mei–Kuei Dorris, who were inside their parked 2010 Honda Civic. One man held a gun to Martin's head and ordered the Dorrises out of the car. After the Dorrises complied, the men got into the car and drove off.

### *Fast and Easy Mart Robbery (count three—§ 211)*

On April 16, 2013, two men holding guns and wearing red bandanas[FN. 2] over their faces entered the Fast and Easy Mart gas station. They pointed their guns at the two store clerks and hit one of the clerks on the head with a gun. The men stole five bottles of liquor and at least $800.

> [FN. 2] During the crime spree at issue here, to throw off police, the participants (Sureños) disguised themselves by wearing red bandanas—the color associated with their rival gang, the Norteños

### *Chevy Trailblazer Carjacking (count four—§ 215, subd. (a))*

On April 23, 2013, Nicki Voresis was at a gas station filling up her Chevy Trailblazer when an Hispanic male approached with a gun in his hand and demanded she get out of the vehicle. Voresis complied and the man and his companion got into the vehicle and drove off.

### *M & N Liquor Robbery (count five—§ 211)*

On April 23, 2013, four Hispanic men entered M & N Liquor wearing red bandanas over their faces. One of the men approached the store clerk, held a gun to his head, and demanded money. A second man in the group also held a gun to a store customer. The clerk complied and the men stole $60 plus a few bottles of liquor. The group fled in a white Chevy Trailblazer.

### *Nissan Maxima Carjacking (count six—§ 215, subd. (a))*

On May 1, 2013, Kenneth Rawls was at a gas station filling up his 2000 Nissan Maxima when two men approached wearing red bandanas over their faces. One had a gun and demanded Rawls get out of the car. Rawls complied and the men drove off in his car.

### *Quick Stop Robbery (count seven—§ 211)*

On May 1, 2013, three men wearing red bandanas over their faces and carrying guns entered the Quick Stop convenience store. The men approached the clerk and demanded money and cigarettes. The clerk complied and the men stole the cigarettes and approximately $400 in cash and left.

3

*Neighborhood Discount Market Robbery (count eight—§ 211)*

On May 15, 2013, a man and a woman entered the Neighborhood Discount Market carrying guns and wearing red bandanas over their faces. The two demanded money from the store clerk and stole $150 plus cigarettes and alcohol. They fled the store in a gold Cadillac, with the female driving.

*Bell Market Robbery (count nine—§ 211)*

On May 18, 2013, a man entered the Bell Market carrying a gun and wearing a red bandana over his face. The man demanded money and stole $700 cash and $300 worth of glass bongs and pipes. The man fled the store in a car waiting for him outside.

*Jack in the Box Robbery (count ten—§ 211)*

On May 20, 2013, Isabel Munoz Vazquez, a Jack in the Box employee, left the restaurant to make a bank deposit of $4,100 in cash. As Vazquez got into her car, two men with their faces covered with red cloths approached, pointed guns at her, and demanded money. The men stole the restaurant's cash and Vazquez's purse and fled in a gold Cadillac driven by defendant.

*Kings Wine and Liquor Robbery (count eleven—§ 211)*

On May 22, 2013, an Hispanic or light-skinned Black man wearing a red bandana on his face and carrying a gun entered Kings Wine and Liquor Store. The man demanded the store clerk give him cigarettes, cash, and liquor. The clerk complied and the man stole $1,700 in cash and $300 worth of liquor and cigarettes.

*Gun possession (count twelve—§ 29820)*

On May 25, 2013, after being alerted to the location of the gold Cadillac, the police searched defendant's residence and found a .380–caliber pistol underneath a bed. Defendant was found hiding in a bedroom closet.

## B. Gang Evidence

*Enhancements on All Counts (§ 186.22, subd. (b)(1) & (4))*

Detective Lizardo Guzman, a member of the Sacramento County Sheriff's Department's gang suppression unit, testified at trial as an expert in Hispanic gangs, both Norteño and Sureño. Guzman testified there are two primary Hispanic gangs in Sacramento, the Norteños and Sureños, and they are rivals. Both the Norteños and Sureños are linked to the prison gangs known as Nuestra Familia and the Mexican Mafia, respectively. The Mexican Mafia is also known as "La Eme" (the pronunciation of the letter "M" in Spanish). Throughout his career, Guzman has had contact with at least 100 Sureños.

The Sureño gang is an umbrella group with subsets or "teams" throughout Sacramento. The Sureño gang is originally from

4

Southern California, so they are not as numerous in Sacramento as the Norteños. Because they are fewer in number in Sacramento, Detective Guzman explained it is "not uncommon to see Sureños from several different neighborhoods or cliques all together getting along ...." Territories are "not as important to Sureños as far as rivals with other Sureños," and a member in good standing is "welcome at any of their gang hangouts." For example, it would not be uncommon to see a Howe Park Sureño member in the area of a south Sacramento Sureño subgroup known as Caya 47th (or 47th Street). The Sureño subsets "all hold their own weight," "sit at the same table," and all attend a monthly meeting to "talk business," which is held at a different location every month.

One of the biggest North Sacramento Sureño subsets is the Howe Park Sureños, with more than 25 members and a territory that includes Howe Park in Sacramento. The Santa Anita Park Sureñas,[FN. 3] which Detective Guzman became aware of as a result of this case, are a female subset of the Howe Park Sureños, and have a territory adjacent to Howe Park. The Angelino Heights Sureños subset is originally from Los Angeles and is now becoming established in Sacramento, with at least six members. The Angelino Heights Sureños in Sacramento must travel monthly to Los Angeles for gang meetings and pay "taxes." The group does not have a specific geographical territory and members "hang out" in Sureño neighborhoods or territories.

[FN. 3.] "Sureña" signifies a female Sureño subgroup or member.

Sureños are generally proud of their gang membership. Like all gangs, members identify themselves with tattoos, brandings, colors, hand signs, who they associate with, and the territories they claim and hang out in. Each member also has a moniker or nickname, in an effort to avoid knowing each others' real names and make it harder for anyone cooperating with the police. Sureños are associated with the number 13, which stands for the letter "M" and shows allegiance to the Mexican Mafia. Sureños are also associated with the color blue, since Mexican Mafia members were issued blue handkerchiefs in prison. In contrast, the Norteños are associated with the color red and the number 14, which corresponds to the letter "N," and Nuestra Familia. Subsets may also have special markers, such as a tattoo with A and H for the Angelino Heights Sureños.

In the 1990s, the Mexican Mafia "sat down" with all the Sureño gang members and set down certain rules, including banning drive-by shootings for Southern California Sureño gang members. In addition, the Mexican Mafia started requiring Sureño subsets to pay "taxes" from the proceeds of their criminal activity. Typically a representative from the prison gang will go out to the Sureño subsets and collect the taxes. In exchange, the Mexican Mafia would provide protection if a Sureño comes to prison. Any Sureño subsets that did not pay taxes would not be protected in prison.

The primary activities of the Sureños are murder, firearm possession, robbery, assault with a deadly weapon, possession of controlled

substances for sale, burglary, carjacking, and home invasion robbery.

Detective Guzman also testified to two predicate offenses: (1) validated Sureño gang member Mario Rodriguez was convicted in 2013 of being a felon in possession of a firearm and being a felon in possession of ammunition (§§ 29800, 30305). Rodriguez admitted to police he had the gun for his protection against rival Norteño gang members; and (2) validated Sureña gang member Daisy Ramirez discharged a handgun at a group of five Norteño gang members and was convicted in 2013 of assault with a firearm and discharging a firearm from a moving vehicle (§ 245, subd. (a)(2), former § 12034, subd. (c)).

In Detective Guzman's opinion, defendant was a member of the Sureños. She had numerous Sureño gang tattoos, including the number 13 on her left hand and three dots on her face and right hand (also symbolizing the number 13). In addition, defendant symbolized her allegiance to the Santa Anitas Park Sureñas with a tattoo of the letters "SPS" on her left index finger. Defendant also symbolized her allegiance to her incarcerated boyfriend David Zamora (a Howe Park Sureño) and her hatred of Norteños with a tattoo of Zamora's California Department of Corrections identification number, which included a crossed out number four.

In 2010, defendant admitted to police she was a Sureña. In addition, police previously found defendant in the company of validated Sureño gang members, including her brother, Adam Velasquez, and Mauricio Saravia, who are both validated Howe Park Sureños. She also texted with other known Sureño members and discussed in those texts at least 10 other previously identified Sureño gang members. She also often used a signature in her text messages indicating she was Sureña.

The prosecutor posed several hypothetical questions to Detective Guzman in line with the evidence presented in the case. Guzman opined the hypothetical crimes as described (robberies and carjackings) would benefit or promote the gang by bringing money into the gang and providing getaway vehicles not associated with the gang. The gang would even benefit if the criminal proceeds were funneled to an incarcerated member because that member would have money to pay for things in jail, such as extra clothing and food, and because it would bring the gang into the good graces of the dominant prison gang, such as the Mexican Mafia. In addition, a gang would benefit from a member possessing a weapon because this is "the ultimate item that demands respect" from both fellow and rival gang members. Finally, planning and executing these crimes would increase the status of the gang and its members and instill fear in the gang's community.

### C. Additional Evidence

At trial, Pedro Madrigal testified he had been a member of the Angelino Heights Sureños since April 2013. Similar to Detective Guzman, Madrigal testified the Sureños originated from the Mexican Mafia and are associated with the number 13 and three dots. The

Sureños also have a particular hand sign known as "The S," which members use to signal they are a Sureño.

Madrigal testified there are four or five Sureño subsets in Sacramento, including Angelino Heights, Howe Park, and Santa Anita Park, all three of which are located in or around Howe Park. According to Madrigal, the Howe Park Sureños had about 100 members, while the Angelino Heights Sureños had about 30 members. Because the Howe Park Sureños have more members, they are "more prestigious" and stronger than the Angelino Heights Sureños. Although some people in the Angelino Heights and Howe Park Sureños dislike each other and do not work together, historically the two groups "all associate together" and have an "alliance." It was common for the Angelino Heights, Howe Park, and Santa Anita Park subsets to share guns.

Madrigal met defendant at a New Year's party and knew her as a member of the Santa Anitas Park Sureñas. At the encouragement of a fellow Angelino Heights Sureño, a few weeks before the crime spree at issue here began, Madrigal attended a meeting of about eight people at the home of a member of the Howe Park Sureños. The group, which included defendant, planned armed robberies to "benefit ... the gang" and "get money so we could get drugs and guns." Although, by the end of the crime spree, Madrigal suspected the money was going to defendant's incarcerated boyfriend Zamora. Madrigal testified he and defendant participated in the carjacking of the Dorrises and the robberies of the Fast and Easy Mart, the Neighborhood Discount Market, the Bell Market, and the Jack in the Box.

(People v. Velasquez, 2017 WL 1025284 at *1-4 (Feb. 17, 2017); see also ECF No. 1 at Ex. A & LD 13 at 2-8.)

IV. Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

7

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, 132 S. Ct. 38, 44-45 (2011)); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 412 (2000)). Circuit court precedent "may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)). However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (citing Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012) (per curiam)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct. Id. Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. Carey v. Musladin, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[4] Lockyer v.

---

[4] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence

8

1    Andrade, 538 U.S. 63, 75 (2003); Williams v. Taylor, 529 U.S. at 413; Chia v. Cambra, 360 F.3d

2    997, 1002 (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ simply

3    because that court concludes in its independent judgment that the relevant state-court decision

4    applied clearly established federal law erroneously or incorrectly.  Rather, that application must

5    also be unreasonable."  Williams v. Taylor, 529 U.S. at 411.  See also Schriro v. Landrigan, 550

6    U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its

7    'independent review of the legal question,' is left with a '"firm conviction"' that the state court

8    was '"erroneous"'").  "A state court's determination that a claim lacks merit precludes federal

9    habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's

10   decision."  Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541

11   U.S. 652, 664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal

12   court, a state prisoner must show that the state court's ruling on the claim being presented in

13   federal court was so lacking in justification that there was an error well understood and

14   comprehended in existing law beyond any possibility for fair-minded disagreement."  Richter,

15   562 U.S. at 103.

16       If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

17   court must conduct a de novo review of a habeas petitioner's claims.  Delgadillo v. Woodford,

18   527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008)

19   (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of

20   § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

21   considering de novo the constitutional issues raised.").

22       The court looks to the last reasoned state court decision as the basis for the state court

23   judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

24   If the last reasoned state court decision adopts or substantially incorporates the reasoning from a

25   previous state court decision, this court may consider both decisions to ascertain the reasoning of

26   the last decision.  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When a

27   _____

28   presented in the state court proceeding."  Stanley, 633 F.3d at 859 (quoting Davis v. Woodford,
     384 F.3d 628, 638 (9th Cir. 2004)).

1  federal claim has been presented to a state court and the state court has denied relief, it may be

2  presumed that the state court adjudicated the claim on the merits in the absence of any indication

3  or state-law procedural principles to the contrary." Richter, 562 U.S. at 99.  This presumption

4  may be overcome by a showing "there is reason to think some other explanation for the state

5  court's decision is more likely." Id. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803

6  (1991)).  Similarly, when a state court decision on petitioner's claims rejects some claims but

7  does not expressly address a federal claim, a federal habeas court must presume, subject to

8  rebuttal, that the federal claim was adjudicated on the merits.  Johnson v. Williams, 568 U.S. 289,

9  298 (2013) (citing Richter, 562 U.S. at 98.  If a state court fails to adjudicate a component of the

10  petitioner's federal claim, the component is reviewed de novo in federal court.  Wiggins v. Smith,

11  539 U.S. 510, 534 (2003).

12      Where the state court reaches a decision on the merits but provides no reasoning to

13  support its conclusion, a federal habeas court independently reviews the record to determine

14  whether habeas corpus relief is available under § 2254(d).  Stanley, 633 F.3d at 860; Himes v.

15  Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  "Independent review of the record is not de novo

16  review of the constitutional issue, but rather, the only method by which we can determine whether

17  a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853.  Where no

18  reasoned decision is available, the habeas petitioner still has the burden of "showing there was no

19  reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98.

20      A summary denial is presumed to be a denial on the merits of the petitioner's claims.

21  Stancle v. Clay, 692 F.3d 948, 957 & n.3 (9th Cir. 2012).  While the federal court cannot analyze

22  just what the state court did when it issued a summary denial, the federal court must review the

23  state court record to determine whether there was any "reasonable basis for the state court to deny

24  relief." Richter, 562 U.S. at 98.  This court "must determine what arguments or theories . . . could

25  have supported the state court's decision; and then it must ask whether it is possible fairminded

26  jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

27  decision of [the Supreme] Court." Id. at 101.  The petitioner bears "the burden to demonstrate

28  that 'there was no reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d

1   925, 939 (9th Cir. 2013) (quoting <u>Richter</u>, 562 U.S. at 98).

2   When it is clear, however, that a state court has not reached the merits of a petitioner's

3   claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

4   habeas court must review the claim de novo.  <u>Stanley</u>, 633 F.3d at 860; <u>Reynoso v. Giurbino</u>, 462

5   F.3d 1099, 1109 (9th Cir. 2006).

6   V.  <u>Petitioner's Claim</u>

7   *The Sufficiency of the Evidence of the Gang Enhancements*

8   Petitioner claims that the gang expert's testimony was insufficient to support the

9   applications of the gang enhancements to her numerous convictions, requiring relief.   (ECF No. 1

10   at 13-20; ECF No. 12 at 3-6.)  Respondent maintains the state court's determination was

11   reasonable and thus precludes federal habeas relief.  (ECF No. 10 at 9-13.)

12   The last reasoned rejection of petitioner's first claim is the decision of the California

13   Court of Appeal for the Third Appellate District on petitioner's direct appeal.  The state court

14   addressed this claim as follows:

15
16   According to defendant, the evidence was insufficient to support the
     gang enhancements because the People failed to establish the
     required element of a "criminal street gang." (§ 186.22, subd. (b)(1)
17   & (4).) Relying on *People v. Prunty* (2015) 62 Cal.4th 59 (*Prunty*),
     defendant contends the predicate offenses testified to by the People's
18   gang expert were committed by members of Sureño subsets that were
     different than the subset to which defendant belonged and there was
19   no substantial evidence linking these subsets to each other or to the
20   greater Sureño gang. We disagree.

21   On appeal of a section 186.22 gang enhancement, """"we review the
     whole record in the light most favorable to the judgment to determine
22   whether it discloses substantial evidence—that is, evidence that is
     reasonable, credible, and of solid value—from which a reasonable
23   trier of fact could find the defendant guilty beyond a reasonable
     doubt. [Citations.]"' ... 'Thus, we presume every fact in support of
24   the judgment the trier of fact could have reasonably deduced from
     the evidence.'" (*People v. Wilson* (2008) 44 Cal.4th 758, 806; see
25   *People v. Ortiz* (1997) 57 Cal.App.4th 480, 484 [substantial evidence
26   standard of review applies to section 186.22 gang enhancements].)

27   Section 186.22, subdivision (b)(1) and (4) increase punishment for
     those who commit felonies "for the benefit of, at the direction of, or
28

11

in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members ...."

A group is a "'criminal street gang'" (§ 186.22, subd. (f)) if: "(1) the group is an ongoing association of three or more persons sharing a common name, identifying sign, or symbol; (2) one of the group's primary activities is the commission of one or more statutorily enumerated criminal offenses; and (3) the group's members must engage in, or have engaged in, a pattern of criminal gang activity. [Citations.] [¶] A 'pattern of criminal gang activity' is defined as gang members' individual or collective 'commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more' enumerated 'predicate offenses' during a statutorily defined time period. [Citations.] The predicate offenses must have been committed on separate occasions, or by two or more persons." (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1457.)

In *Prunty*, the court held that "where the prosecution's case positing the existence of a single 'criminal street gang' for purposes of section 186.22[, subdivision] (f) turns on the existence and conduct of one or more gang subsets, then the prosecution must show some associational or organizational connection uniting those subsets." (*Prunty, supra*, 62 Cal.4th at p. 71.) There are multiple ways to show such a connection, such as "evidence of collaboration or organization, or the sharing of material information among the subsets of a larger group. Alternatively, it may be shown that the subsets are part of the same loosely hierarchical organization, even if the subsets themselves do not communicate or work together. And in other cases, the prosecution may show that various subset members exhibit behavior showing their self-identification with a larger group, thereby allowing those subsets to be treated as a single organization." (*Ibid*.) Ultimately, the People must show the defendant sought to benefit the "same 'group' that meets the definition of section 186.22[, subdivision] (f)—i.e., that the group committed the predicate offenses and engaged in criminal primary activities ...." (*Prunty*, at p. 72.)

We conclude the evidence presented at trial sufficiently established the existence of a criminal street gang under *Prunty* because the prosecution offered evidence of an organizational connection between the Sureño umbrella group and its Sacramento subsets. The gang expert testified that the Mexican Mafia asserts authority over all the Sureños, including setting rules such as banning drive-by shootings and requiring payment of "taxes" to the Mexican Mafia, in exchange for protection of incarcerated Sureños. In addition, the prosecution established an organizational connection among the

Sacramento Sureño subsets. The gang expert testified that members of different subsets are commonly seen together in the same vicinity and territory, "getting along." "As long as [a gang member is] in good standing with the [Sureño] gang, they're welcome at any of their gang hangouts." Significantly, the Sacramento Sureño subsets "sit at the same table" and work together, including holding monthly meetings to "talk business." Defendant's accomplice, Madrigal, also testified that the Angelino Heights and Howe Park Sureños have a historical alliance and share guns among themselves and with the Santa Anita Park Sureñas.

That the Sureño subsets were working together and had an organizational connection is further indicated by the testimony of Madrigal who explained defendant and members of two other Sureño subsets met and planned the crimes at issue here to "benefit ... the gang" and "get money so we could get drugs and guns." Even if the criminal proceeds went to inmate Zamora, according to Detective Guzman, the gang would still benefit because committing the crimes would enhance the gang's status within the community, help the gang get better at committing crimes, and bring the gang into the good graces of the Mexican Mafia.

Accordingly, there was substantial evidence upon which the jury could reasonably conclude the larger Sureño gang qualified as a criminal street gang, and that defendant committed the crimes at issue here for the benefit of the larger Sureño gang with the intent to further the gang's activities. We find no error.

(People v. Velasquez, 2017 WL 1025284 at *4-6; LD 13.)

                        Applicable Legal Standards

The Due Process Clause of the Fourteenth Amendment protects a criminal defendant from conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). Thus, one who alleges that the evidence introduced at trial was insufficient to support the jury's findings states a cognizable federal habeas claim. Herrera v. Collins, 506 U.S. 390, 401-02 (1993). Nevertheless, the petitioner "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). On direct review, a state court must determine whether "any rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v.</u>

<u>Virginia</u>, 443 U.S. 307, 319 (1979).  Federal habeas relief is available only if the state court

determination that the evidence was sufficient to support a conviction was an "objectively

unreasonable" application of Jackson.  <u>Juan H.</u>, 408 F.3d at 1275 n.13.

Habeas claims based upon alleged insufficient evidence therefore "face a high bar in

federal habeas proceedings because they are subject to two layers of judicial deference."

<u>Coleman v. Johnson</u>, 566 U.S. 650, 651 (2012) (per curiam).  As noted by the Supreme Court:

> First, on direct appeal, "it is the responsibility of the jury−not the court−to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'"

<u>Id.</u> (citations omitted).

The <u>Jackson</u> standard "must be applied with explicit reference to the substantive elements

of the criminal offense as defined by state law." <u>Jackson</u>, 443 U.S. at 324 n.16.  In performing a

<u>Jackson</u> analysis, a jury's credibility determinations are "entitled to near-total deference." <u>Bruce</u>

<u>v. Terhune</u>, 376 F.3d 950, 957 (9th Cir. 2004).  When the factual record supports conflicting

inferences, the federal court must presume that the trier of fact resolved the conflicts in favor of

the prosecution, and must defer to that resolution.  <u>Jackson</u>, 443 U.S. at 326.

The <u>Jackson</u> standard also applies to state sentence enhancements: a petitioner can obtain

habeas relief if no rational trier of fact could find the elements of the enhancement true beyond a

reasonable doubt.  <u>Garcia v. Carey</u>, 395 F.3d 1099, 1102 (9th Cir. 2005).

<u>Analysis</u>

The undersigned considers whether the Third District Court of Appeal's decision that

there was sufficient evidence to support the gang enhancements in this case was a reasonable

determination in light of Supreme Court precedent.  It was.

14

Initially, the undersigned notes that to the degree petitioner's argument can be interpreted to allege the state appellate court's decision was based on an unreasonable determination of the facts in light of the evidence presented at trial (28 U.S.C. § 254(d)(2)), she is mistaken.  A review of the testimony and evidence of record reveals no unreasonable determination of facts.  Stanley, 633 F.3d at 859.  Further, despite her assertion to the contrary (ECF No. 12 at 3), petitioner has not "rebutted the state court decision with 'clear and convincing evidence.'"

Here, the state appellate court found the criminal street gang evidence sufficient pursuant to People v. Prunty, 62 Cal.4th 59 (2015) because the evidence proffered at trial established the existence of an organizational or associational connection between the Sureño umbrella group and the Sacramento subsets.

Petitioner's claim is based on the requirement articulated by the California Supreme Court in Prunty that "where the prosecution's case positing the existence of a single 'criminal street gang' for purposes of section 186.22(f) turns on the existence and conduct of one or more gang subsets, then the prosecution must show some associational or organizational connection uniting those subsets."  People v. Prunty, 62 Cal.4th at 71.  According to the court in Prunty, "to be part of a 'criminal street gang,' subsets must share some associational or organizational connection with the larger group, whether arising from individual members' routine collaboration with each other or otherwise."  Id. at 72.  "The prosecution's evidence must permit the jury to infer that the 'gang' that the defendant sought to benefit, and the 'gang' that the prosecution proves to exist, are one and the same."  Id. at 75.  The court explained that "[e]vidence -- even indirect evidence -- showing collaboration among subset members, long-term relationships among members of different subsets, use of the same 'turf,' behavior demonstrating a shared identity with one another or with a larger organization, and similar proof will show that individual subsets are part of a larger group ...."  Id. at 73-74.  The court offered several "illustrative examples of how the prosecution can show a criminal street gang to exist" where it is argued that "alleged gang subsets should in fact be treated as a single entity," id. at 76, including "shared bylaws or organizational arrangements"; control of the subsets by "the same locus or hub," such as when "each subset contains a 'shot caller' who 'answer[s] to a higher authority' in the [umbrella gang's] chain of

15

command"; the sharing of gains derived from independent activities; protection of the same territory or turf by two or more different subsets; collaboration among different subsets to "accomplish shared goals"; and the exchange of "strategic information" or participation "in the kinds of common activities that imply the existence of a genuinely shared venture," among other possible evidence.  Id. at 76-78.

    With specific regard to the predicate offense evidence, Detective Lizardo Guzman testified that in September 2012 his department conducted a probation search of validated Sureño gang member Mario Rodriguez at 6100 Dove Court in Sacramento.  A firearm and ammunition were found during the search and Rodriguez admitted possession of the firearm and ammunition as protection against rival Norentos; Rodriguez was convicted of being a felon in possession of both a firearm and ammunition, and was serving a four-year prison sentence as a result of his two convictions.  (LD 8 at 277-79, 282.)  Next, Guzman testified that in March 2011 Daisy Ramirez, a validated Sureña gang member, discharged a firearm from her car at a group of five rival Norteños at Rosario Boulevard and San Novato Way in North Highlands.  Ramirez later pled guilty to assault with a deadly weapon involving a firearm and to discharging a firearm from a moving vehicle and is serving twenty years in state prison.  (LD 8 at 279-282.)

    Detective Guzman testified there are two primary Hispanic gangs in Sacramento County: the Norteños and Sureños.  (LD 8 at 261.)  Norteños on the outside are associated with the prison gang Nuestra Familia, and Sureños on the outside are associated with the Mexican Mafia prison gang.  (LD 8 at 261, 269.)  The Sureños originated in Southern California but can be found in Sacramento.  (LD 8 at 263.)  Under the Sureño umbrella are a number of subsets in the Sacramento area, including "SHG," a North Highlands subset, "VST" or Varrio Sur Trese, and "Caya 47th" in South Sacramento.  (LD 8 at 263.)  The Howe Park Sureños is also one such subset, and within that subset is the Santa Anitas Park Sureños ("SPS"), a sub-subset of female gang members.  (LD 8 at 266, 277; see also LD 9 at 45.)  Additionally, in Sacramento there is a subset originating from Southern California called the "Angelinos Heights Sureños" and because there is no Angelinos Heights neighborhood in Sacramento, a member of the small subset travels once a month to Southern California to attend monthly gang meetings and to pay taxes.  (LD 8 at

1   276-277.)  Guzman further testified that it was not uncommon for law enforcement to contact

2   North Sacramento gang members in the company of South Sacramento gang members, or to see

3   Sureños from several different neighborhoods or cliques "all together getting along."  (LD 8 at

4   263-264.)  On cross-examination, Guzman testified that while the Howe Park Sureños were the

5   largest of the Sureño subsets, "they all hold their own weight" and "sit at the same table" and "all

6   attend a monthly meeting," including the Santa Anitas Park Sureñas.  (LD 9 at 46-47, 56-57.)

7   The meetings typically occur on the 13th of the month in different locations, wherein the subsets

8   all get together to meet and talk business.  (LD 9 at 46-47.)

9          The Mexican Mafia prison gang requires the payment of taxes from Sureño street gangs

10  and their subsets to ensure protection for any Sureño gang member sentenced to serve time in

11  prison and has decried drive-by shootings by its members following an incident in Southern

12  California resulting in the death of a child bystander.  (See LD 8 at 269-70.)  The primary

13  criminal activities committed by Sureño gang members are murder, possession of firearms,

14  robbery, assault with a deadly weapon, possession of controlled substances for sale, burglary,

15  carjacking and home invasion robbery.  (LD 8 at 274-75.)

16         Detective Guzman testified about the relationship between the Howe Street and Angelino

17  Heights Sureño gang members: "they all get along together," and that it is "not uncommon to see

18  Sureño gang members from different neighborhoods or cliques as they like to stay together,

19  hanging out together, working together."  (LD 8 at 289.)  And because the Angelino Heights

20  subset does not have or claim its own geographical area, it is "not uncommon to see [Angelino

21  Heights members] hanging out" in other subset neighborhoods such as Howe Park territory near

22  Howe Park and Bell Avenue, or even to see Caya47th gang members in Howe Park territory or

23  Howe Park gang members at Chateau Lang which is a Caya47th hangout.  (LD 8 at 289-290.)

24         Detective Guzman believed petitioner to be a Sureño gang member based in part of her

25  tattoos (LD 8 at 291-98), prior contacts with and claims to law enforcement (LD 8 at 300-01 &

26  LD 9 at 2-3).  Petitioner's text messages, admitted into evidence, further supported his opinion.

27  (LD 9 at 3-6.)  Also, in Guzman's opinion, even a female organizing, recruiting, threatening,

28  cajoling, providing equipment for and acting as a driver during criminal activity is committing

1  crimes in association with a criminal street gang, and that "person is a shot caller," someone

2  fellow gang members respect enough to follow and assist.  (LD 9 at 39-41.)

3       In Guzman's opinion, robbery, and the proceeds of those crimes, benefit the Sureño gang,

4  as does the crime of carjacking because that crime facilitates the commission of other criminal

5  activities.  (LD 9 at 33.)  Even where the proceeds of those crimes are being funneled to a Sureño

6  inmate serving time in state prison, where that individual seemed to direct or assist in those

7  crimes, there remains a benefit to the gang.  (LD 9 at 33-34.)  The money sent to the Sureño gang

8  member inmate serving time in state prison benefits the Mexican Mafia prison gang and "elevates

9  that Sureño gang subset in the eyes of that stronger dominant prison gang."  (LD 9 at 36.)  And,

10  when that inmate is ultimately released back to the streets as a Sureño gang member, the

11  individuals who assisted him will be in that "O.G.'"s good graces.  (LD 9 at 37.)  Further, the

12  "soldiers" in the gang who carry out the robberies and carjackings in association with Sureño

13  street gangs will gain respect and see their status increased, thereby increasing the reputation of

14  the gang as a whole.  (LD 9 at 37-38.)

15       Further, the testimony of Pedro Madrigal, an Angelino Heights Sureño[5] directly involved

16  in a number of the carjacking and robbery crimes at issue in this case, supports the state court's

17  determination that the evidence was sufficient to support the gang enhancements here.  (See, e.g.,

18  LD 7 at 199-212 [Sacramento subsets hung out and worked together], 218 [Angelino Heights

19  (A.H.) and Howe Park members "all associate together"], 219-22 [these crimes were planned

20  together], 225-27 [told to go by petitioner], 228 [petitioner provided beanies & bandanas], 234

21  ["Mudo" (Howe Park gang member) provided the guns], 268 [petitioner wanted him to do more

22  robberies], 269 [petitioner always at Mudo's house so they always met there beforehand], 274-75

23  [beanies & bandanas came from petitioner's car], 277 [latex gloves used came from petitioner's

24  car], 285 [used same equipment at subsequent robbery], 286 [guns in bag too with beanie's in

25  petitioner's car]; see LD 8 at 8 [gun used in Jack in the Box robbery came from Mudo], 13-14

26  [common to share guns among A.H, Howe Park & SPS], 26 [petitioner had "some" authority,

27  _____

28  [5] Guzman was familiar with Pedro Madrigal and knew him to be a validated Angelino Heights Sureño.  (LD 9 at 26-27.)

1   Mudo had authority], 27 [petitioner and Mudo agreed], 54-55 [A.H. & Howe Park get along and

2   work together], 64-66 [doesn't know who's in charge of Howe Park but Mudo is "up there"], 66-

3   67 [doesn't know if Howe Park took orders from a female but "they all agreed on doing

4   something together"], 77 [he respected petitioner] 78 [if an A.H. member was not at a meeting, all

5   were told what happened at the meeting so they would be "on the same basis"], 80 [meeting at

6   Sacramento River attended by Howe Park & A.H. members and petitioner, as SPS member].)

7       Here too, the jury plainly found gang expert Guzman and Angelino Heights gang member

8   Madrigal credible, and there is no basis to upset the "near-total deference" to which the jury's

9   findings are entitled.  Bruce v. Terhune, 376 F.3d at 957.

10      The record in this case reveals sufficient evidence of collaboration and association

11  between the various Sureño subsets in Sacramento, for the benefit of the Sureño gang, including

12  evidence of petitioner's organization of and leadership role in the numerous crimes, involving

13  members of different subsets, of which she was convicted.  (See, e.g., LD 9 at 10-26, 34-35, 39-

14  41, 47 58-60.)  This case is unlike Prunty, as the Third District Court of Appeal held, because

15  there was evidence showing collaboration among Sureño subset members that permitted the jury

16  to reasonably infer that the Sureño gang petitioner sought to benefit is one and the same with the

17  Sureño gang the People proved the existence of.  A rational trier of fact could have found the

18  essential elements of section 186.22 present here.  Jackson, 443 U.S. at 319; Garcia v. Carey, 395

19  F.3d at 162.

20      The undersigned disagrees with petitioner that Guzman's testimony was too general, or

21  that Prunty demands more than was elicited here at trial.  And, the fact Guzman testified he had

22  not previously been aware of the all-female Santa Anitas Park sub-subset does not make the

23  evidence elicited at trial insufficient.  Nor does People v. Nicholes, 246 Cal.App.4th 836 (2016)

24  help petitioner's case.  In Nicholes, the gang expert's testimony involved predicate offenses

25  involving members of the umbrella gang occurring in different areas – Sacramento County and

26  Sutter County - in the absence of evidence that the subsets shared information or were commonly

27  present in the same vicinity, or were otherwise associated with one another.  Nicholes, at 845-

28  848.  Those facts are dissimilar to the facts adduced here.  While the predicate offenses in this

19

1  case could or may have involved gang members of another subset of the Sureños gang overall, all

2  areas referenced involved Sacramento (i.e., 6100 Dove Court & Rosario Boulevard and San

3  Novato in the North Highlands area) rather than some other geographical location and evidence

4  established association between Sacramento subsets.

5          The Third Appellate District's determination is not "so lacking in justification that there

6  was an error well understood and comprehended in existing law beyond any possibility for fair-

7  minded disagreement."  Richter, 562 U.S. at 103.

8           Given the foregoing, it was not an unreasonable application of the Jackson standard for

9  the state appellate court to conclude that there was sufficient evidence to permit the jurors to draw

10  the reasonable inference that the Sacramento Sureño gang's members engaged in a pattern of

11  criminal activity, nor did the state appellate court base its finding on an unreasonable application

12  of the facts.  Therefore, it cannot be said that the Third District Court of Appeal's rejection of

13  petitioner's challenge to the sufficiency of the evidence was "objectively unreasonable."  See

14  Coleman, 566 U.S. at 651; Juan H., 408 F.3d at 1275 n.13.  As a result, the undersigned

15  recommends the claim be denied.

16  VI.  Conclusion

17          Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

18  habeas corpus be denied.

19          These findings and recommendations are submitted to the United States District Judge

20  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

21  after being served with these findings and recommendations, any party may file written

22  objections with the court and serve a copy on all parties.  Such a document should be captioned

23  "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections,

24  he shall also address whether a certificate of appealability should issue and, if so, why and as to

25  which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the

26  applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C.

27  § 2253(c)(3).  Any response to the objections shall be filed and served within fourteen days after

28  service of the objections.  The parties are advised that failure to file objections within the

20

1    specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951

2    F.2d 1153, 1156 (9th Cir. 1991).

3    Dated:  September 21, 2020

4

5    Vela1995.157

                                              KENDALL J. NEWMAN

                                              UNITED STATES MAGISTRATE JUDGE